UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DEWAYNE THOMPSON,

Plaintiff,

v.

P. KUPPINGER, et al.,

Defendants.

No.  2:23-cv-0463-DJC-EFB (PC)

FINDINGS AND RECOMMENDATIONS

Plaintiff is a state prisoner proceeding without counsel in an action brought under 42 U.S.C. § 1983.  On February 13, 2024, pursuant to 28 U.S.C. § 1915A(a), the court determined that plaintiff's first amended complaint (FAC) alleged the following potentially cognizable claims:

Claim 1:  Eighth Amendment conditions of confinement claim and First Amendment retaliation claim against Struve and Heinkel;

Claim 2:  Eighth Amendment deliberate indifference claim against Pohovich and Lujan;

Claim 4:  Eighth Amendment excessive force claim against Pohovich and Lujan;

Claim 5:  First Amendment retaliation claim against Kuppinger;

Claim 6:  First Amendment retaliation claim against Haynie, Heinkel, and Struve;

Claim 8:  First Amendment retaliation claim against Heinkel and Pohovich;

Claim 9:  Eighth Amendment deliberate indifference claim against Aung;

1

Claim 10: First Amendment retaliation claim against Aung.

ECF No. 18. Defendant Aung is a physician, Haynie is a correctional lieutenant, Heinkel and Struve are correctional sergeants, and all remaining defendants are correctional officers. ECF No. 12 at 2-3. Plaintiff has filed a motion for summary judgment, to which defendants have responded, and plaintiff has replied. ECF Nos. 29, 38, 41. Defendants have filed a cross-motion for summary judgment, to which plaintiff has responded, and defendants have replied. ECF Nos. 36, 40, 42.

The court previously issued findings and a recommendation to deny plaintiff's motion for summary judgment and to grant defendants' motion for summary judgment. ECF No. 44. Plaintiff objected on the grounds that he did not have adequate opportunity to address subparts of Claims 4 and 8. ECF No. 45. Accordingly, the court vacated the prior recommendation as to Claims 4 and 8 (ECF No. 47 at 3-4) and ordered further supplemental briefing as to those subparts only. The parties have since filed their supplemental briefs, ECF Nos. 48, 50, and the court now enters this full revised memorandum which sets forth in a single document the findings and recommendations as to all claims 1) revising the court's analysis and recommendation only as to the contested subparts of Claims 4 and 8, and 2) confirming the court's analysis and recommendation as to all other claims and subparts.

For the following reasons, plaintiff's motion for summary judgment must be denied, and defendants' motion for summary judgment must be granted except as to the subpart of Claim 4 that alleges defendants Pohovich and Lujan used excessive force in violation of the Eighth Amendment in the course of removing plaintiff's handcuffs and returning him to his cell on January 8, 2023.

The FAC

Plaintiff alleges a lengthy narrative of events and interactions with defendants and other prison staff. The allegations of the FAC are set forth here in some detail to provide context for plaintiff's claims.

////

////

2

A.      Allegations Relating to the Rain Event and Cell 208 (Claims 1, 2 and 4)

Plaintiff alleges he arrived at CSP-Sacramento on December 20, 2022. ECF No. 12 at 4. On December 23-24, 2022, while he was housed in cell 209 of Building B-1 ("Cell 209") his cell was flooded with "substantial brown contaminated leakage" during heavy rains. *Id*. at 4. He brought this condition to the attention of correctional staff (none of the defendants) but his request to be moved out of Cell 209 was ignored and so he "committed an indecent infraction" in order to be moved to housing in administrative segregation. *Id*.

On January 7, 2023,[1] plaintiff was released from administrative segregation and housed back in Building B-1 in the cell next to his previous housing ("Cell 208"). *Id*. at 5. He knew from his experience in Cell 209 that Cell 208 also experienced leakage and flooding. He brought this to the attention of defendant **Struve**. Struve said he would put in a work order, but plaintiff alleges this never happened. Plaintiff submitted a grievance that night.

Rain began at 1:00 a.m. on January 8, 2023, and Cell 208 began to leak and flood "brown contaminated fluid" that burned plaintiff's eyes, nose cavities, and throat. *Id*. At 4:30 a.m., plaintiff informed staff that he was having suicidal ideations. He slipped and fell and twisted his right ankle on his way to the holding cage to be evaluated, then he was admitted to a crisis bed in a different building, but he was discharged from there at 9:00 a.m. the same day. None of the defendants was involved in these events.

Defendant **Pohovich**, along with another non-defendant officer, escorted plaintiff after discharge from the crisis bed. *Id*. The escorting officers allegedly made plaintiff walk faster than his normal pace. *Id*. at 8. Plaintiff once again fell and was evaluated by a nurse. *Id*. at 5, 8. Pohovich "tried to cover up liability by stating Plaintiff set [sic] down[.]" *Id*. at 8. Plaintiff again twisted his right ankle and had pain in his ankle and back. *Id*.

Pohovich and the other officers placed plaintiff on a gurney to finish escorting him back to Cell 208. *Id*. at 5, 9. Upon arrival, Pohovich allegedly twisted plaintiff's handcuffs to cause pain and twisted his fingers "as if she was aiming to break them." *Id*. at 5, 9, 12. Defendant **Lujan**

---

[1] The FAC states this date was "June 7, 2023," but this is clearly an error. The narrative timeline of the FAC indicates that the actual date of plaintiff's release from administrative segregation must have been January 7, 2023.

"began to subtly hit Plaintiff in left ribs while saying, 'Swing on me N****r,' in efforts to get Plaintiff to swing on him." *Id*. at 5, 12.  Pohovich, Lujan, and the other officers pushed him "into puddle of contaminated water from leakage flooding his cell.  Lujan stated 'It's best you behave, N****r,' as cell door closed." *Id*. at 5, 12.

On January 10, 2023, plaintiff was once again in a holding cell to be evaluated for suicidal ideation because of the flooding, where he encountered **Struve** and asked about moving to another cell.  Struve said "I'm on the job," in an allegedly sarcastic manner which "provoked" plaintiff to "vent of grieving and forewarning of lawsuit." *Id*. at 6.  Struve answered that plaintiff could find someone else to move him. *Id*.

On January 11, plaintiff complained to defendant **Heinkel** about the flooding and asked to be moved. *Id*. at 7.  Heinkel told plaintiff that a damaged roof was causing flooding throughout the B-1 building, and that plaintiff would have to bear with it until County Jail inmates who were housed in the B-5 building could be transferred out of there so that B-1 inmates could be moved into B-5.

On January 12, Heinkel "had opportunity to move Plaintiff to B8-110, which Plaintiff witnessed was vacant." *Id*.  This was presumably a cell in another building ("B8").  Heinkel refused, and plaintiff "forewarned of grieving his derelict and callous disregard to his health and safety." *Id*.  Heinkel allegedly answered that he leads the league in grievances and the more plaintiff complained, the longer it will take to move him.  Plaintiff alleges that in an act of frustration he tried to shatter his cell front window "with a fragile rock," but the window did not break. *Id*.

Also on January 12, 2023, plaintiff received medical attention for the falls he had experienced on January 8. *Id*. at 9.  He was given an X-ray which allegedly "showed swelling from sprain that was causing pain." *Id*.  The doctor "applied ice and ordered orthotic shoes, ankle brace, and compression socks … and Voltaren topical." *Id*.

////

////

////

4

B.     Allegations Relating to Property (Claim 5)

On January 14, 2023, all the building B-1 inmates including plaintiff were moved to building B-5. *Id*. at 7.  Plaintiff had apparently deferred picking up his property which had been transferred from the Corcoran prison in December 2022, and he elected to pick it up after arriving in his new housing in building B-5. *Id*. at 13.  Defendant **Kuppinger** was the property officer.  Kuppinger had allegedly witnessed plaintiff complain about conditions in his cell and what plaintiff describes as "Plaintiff ranting to his co-workers and superiors of grieving and bringing lawsuit against them for his living conditions." *Id*.

On January 16, 2023, plaintiff went to claim his property.  Kuppinger had already taken plaintiff's property out of the boxes it had been packed in, which plaintiff claims Kuppinger should not have done outside of plaintiff's presence. *Id*.  Plaintiff alleges it was immediately apparent that his property had been "reduced," meaning that some of it was missing. *Id*.  Whereas he had had nine boxes of property when he arrived at CSP-Sacramento, including three boxes of legal property, there now appeared to be only about five total boxes of property. *Id*.  Plaintiff asked Kuppinger about this.  Kuppinger allegedly answered:  "We got work to do.  You want to make all this noise about your housing … and make threats about grievances and lawsuits with all the suicidal b******t, Ima go off property matrix and break you down." *Id*.  Plaintiff claims Kuppinger's normal practice was to just give inmates their property "if it was no serious contraband," and so Kuppinger's strict adherence to policy in this instance was exceptional.  Kuppinger began dispensing the property to plaintiff and told plaintiff to sign the property receipt.  Plaintiff refused because he would thereby have waived his right to grieve the loss and damage of personal and legal property.

Plaintiff asked to see his appliances and legal property.  Kuppinger then informed plaintiff that his television and typewriter were damaged when they arrived from CSP-Corcoran. *Id*. at 14.  Plaintiff had watched staff at CSP-Corcoran pack his belongings on December 19, 2022, and he alleges the property was not damaged at departure.  Plaintiff's refusal to sign the receipt on January 16 meant he could not retrieve his property at that time.

////

On January 29, 2023, plaintiff signed the property receipt because he had decided he could not wait for the grievance process to be completed and he had lost faith in it. Plaintiff's retrieved typewriter did require some repair to type capital letters, with the assistance of a jailhouse handyman. *Id*. at 15. But plaintiff discovered that most of his law books were missing. *Id*. at 14. He grieved Kuppinger's handling of the property transfer.

On April 19, 2023, a non-defendant officer (Williams) inspected, inventoried, and packed plaintiff's property when plaintiff was moved to administrative segregation. *Id*. at 15. Kuppinger allegedly "went out of his way" to inspect plaintiff's property "like a fine tooth comb" while plaintiff was in administrative segregation. Plaintiff alleges Kuppinger was the assigned property officer for the B building, but not for the building where administrative segregation was housed. Also, Kuppinger turned off his body camera while inspecting plaintiff's property. Plaintiff alleges Kuppinger must have searched every one of plaintiff's legal documents, because he confiscated plaintiff's sewing needles that were hidden in the legal documents. *Id*. at 15 n.1.

Kuppinger confiscated plaintiff's typewriter, but plaintiff did not discover this until June 16, 2023 when he was released from administrative segregation and retrieved his property. *Id*. at 15. Plaintiff alleges the confiscation was retaliatory because Kuppinger knew plaintiff used the typewriter to prepare his grievance against Kuppinger.

C.      Allegations Relating to Rules Violation Report (Claim 6)

The FAC alleges that defendant **Heinkel** filed a false rules violation report (RVR) against plaintiff, **Struve** reviewed it, and **Haynie** classified it as serious.[2] *Id*. at 17. The RVR reported that plaintiff had falsified a grievance, but plaintiff alleges that defendants' roles with respect to the RVR were retaliation for his grievances. *Id*. at 18. Plaintiff alleges he was "acquitted" of the RVR on March 9, 2023. *Id*. at 17.

////

////

////

---

[2] According to the copy of the RVR that defendants have entered into the evidentiary record, Heinkel initiated the RVR on January 31, 2023. ECF No. 36-10; *id*. at 28.

D.      Allegations Relating to Cell Search (Claim 8)

The FAC alleges that **Heinkel** and **Pohovich** searched plaintiff's cell "when there was no reasonable suspicion or penological interest in doing so."[3] ECF No. 12 at 20.  The cell search was allegedly retaliation for plaintiff's filing of grievances and this lawsuit and also retaliation for plaintiff's seeking emergency medical treatment for an anxiety attack.  *Id*.  In the course of the cell search, officers acting under the supervision of Heinkel 1) destroyed some of plaintiff's legal papers with a wet substance, 2) broke his headphones, and 3) took personal pictures and a storage box that plaintiff used to organize his legal papers and also to wash his laundry.  *Id*.  Plaintiff alleges the search violated his First Amendment right of access to the courts.

E.      Allegations Relating To Medical Care (Claims 9 and 10)

Deliberate Indifference.  Plaintiff was seen by his primary care physician for ankle and foot pain related to his falling on January 8, 2023.  ECF No. 12 at 21.  The physician at that time was Hlaing.  Defendant grieved Hlaing's alleged failure to treat plaintiff's back injury, and the nurse who reviewed plaintiff's grievance referred him for treatment of his back pain.  Meanwhile, defendant **Aung** succeeded Hlaing as primary care physician.  *Id*.  Aung saw plaintiff on March 17, 2023, and chose a conservative course of action "by merely telling plaintiff to stretch."  *Id*.  Plaintiff alleges this constituted deliberate indifference (Claim 9).  *Id*. at 22.  Plaintiff "forewarned Aung that he 'will write it up' (grieve) his inadequate medical treatment by denying him X-ray, back brace or Ace bandage."  *Id*. at 22.  Aung "invidiously responded, make sure you spell my name right; though, he had no name tag."  *Id*.

Retaliation.  Plaintiff alleges that Aung was "bitter" because of this "forewarning" at their next appointment on April 11, 2023.  *Id*. at 24.  Plaintiff was anticipating the expiration of his medical authorization for durable medical equipment (DME), consisting of orthotic shoes with custom insoles, ankle brace, and compression socks.[4]  *Id*. at 24, 25.  The DME authorization was

---

[3] The FAC alleges the cell search happened on February 4, 2023, but the parties now agree that it occurred on April 4, 2023.  *See* ECF No. 36-7 at 3 ¶ 10 (Pohovich); ECF No. 36-10 at 6 ¶ 21 (Heinkel); ECF No. 40 at 24, 25 (plaintiff); ECF No. 42 at 38.

[4] The authorization had apparently been given by Aung's predecessor Hlaing, on a temporary but renewable basis.  ECF No. 12 at 25.

7

scheduled to expire on July 21, 2023. *Id*. at 24. Plaintiff pleaded for Aung to renew the DME authorization, but Aung "with joy said 'don't come to prison.'" *Id*. at 25. Plaintiff responded with a "vent of going to 'write him up' again." *Id*. Aung then "instantly and ninety day prematurely cancelled [plaintiff's] orthopedic shoes, ankle brace, compression socks [as] well as OTC arthritis pain medicine that preceding PCPs ordered." *Id*. Plaintiff alleges this was retaliation for plaintiff's grievance threat on March 17 (Claim 10). When plaintiff went to segregation in April 2023, he "instantly sought medical treatment" from the medical provider for that building (Bharat) who restored all the DME orders. *Id*.

The Cross-Motions For Summary Judgment

All parties move for summary judgment on all claims. As discussed below, the parties have many factual disputes but the evidence fails to demonstrate a genuine issue of material fact as to each of the plaintiff's claims, except as to the subpart of Claim 4 alleging excessive use of force by defendants Pohovich and Lujan. The parties' evidence and their legal arguments will be set forth as they are relevant to the separate claims against the individual defendants.

The Evidentiary Record

In support of his motion for summary judgment, plaintiff submits his own declaration (ECF No. 29 at 2-16), a series of statements of undisputed facts (*id*. at 17-48), a grievance he lodged against Heinkel (*id*. at 63-69), a grievance he lodged against Pohovich and Lujan (*id*. at 70-78), and a grievance he lodged against Kuppinger (*id*. at 79-97).[5]

In support of defendants' motion for summary judgment, they submit their own declarations with exhibits.[6]

In opposition to defendants' motion for summary judgment, plaintiff submits: (1) his verified account of events (ECF No. 40 at 2-30); (2) six sets of disputed facts (ECF Nos. 40-1

---

[5] Plaintiff submits another grievance lodged against defendants who have been dismissed (Banish, UHDE, and Chavez). ECF No. 29 at 49-62.

[6] Aung declaration (ECF No. 36-4); Haynie declaration (ECF No. 36-5); Pohovich declaration, with video exhibit (ECF No. 36-7); Lujan declaration (ECF No. 36-7 and 36-8 (exhibits)); Struve declaration (ECF No. 36-9); Heinkel declaration (ECF No. 36-10); Kuppinger declaration (ECF No. 36-11); Kuppinger's second declaration (ECF No. 42-1). Defendants also submit the declaration of non-party A. De La Torre (ECF No. 36-6).

8

through 40-7); and (3) a "voluminous appendix A-N" containing discovery responses and grievance records (ECF No. 39).[7]

In their final replies, all parties have submitted their own versions of lists of undisputed facts.  ECF No. 41; ECF No. 42 at 13-42.

In their supplemental briefs, none of the parties has submitted any additional evidence regarding the contested subparts of Claims 4 and 8.  ECF Nos. 48, 50.

Summary Judgment Standard Under Rule 56

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case."  *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof

---

[7] Heinkel discovery responses (ECF No. 39 at 2-22); Struve discovery responses (*id*. at 23-38); Haynie discovery responses (*id*. at 39-48); Pohovich discovery responses (*id*. at 49-61); Lujan discovery responses (*id*. at 62-73); Aung discovery responses (*id*. at 74-90); Kuppinger discovery responses (*id*. at 91-106); and grievance records (*id*. at 107-226).

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, . . ., is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987), *overruled on other grounds as stated in Flood v. Miller*, 35 F. App'x 701, 703 n.3 (9th Cir. 2002).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Central Costa County Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

10

*aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

Eighth Amendment Conditions of Confinement (Claim 1)

A.      Legal Standard - Conditions of Confinement

"An Eighth Amendment claim that a prison official has deprived inmates of humane conditions of confinement must meet two requirements, one objective and one subjective."  *Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1994) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  The objective test requires the inmate to show conditions of confinement that deny the minimal civilized measure of life's necessities.  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  These are "conditions posing a substantial risk of serious harm that present an excessive risk to his health or safety."  *Norbert v. City and County of San Francisco*, 10 F.4th 918, 927-928 (9th Cir. 2021) (citation and quotation marks omitted).  Because the sufficiency of a conditions-of-confinement claim depends upon the particular facts of each situation, the "circumstances, nature, and duration" of the challenged conditions must be carefully considered.  *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).  Conditions of confinement in combination may have a "mutually enforcing effect" that deprives a single identifiable human need such as food, warmth, or exercise, but "[a]morphous overall conditions cannot rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists."  *Brown v. Bueno*, No. 1:17-cv-01295-LJO-SKO (PC), 2018 WL 6068513, at *3 (E.D. Cal. Nov. 20, 2018) (citing and quoting *Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991) (internal quotation marks omitted)).

The subjective test requires a showing that the prison official's state of mind was deliberately indifferent -- a wanton state of mind.  *Norbert*, 10 F.4th at 928; *Wilson*, 501 U.S. at 302.[8]  When considering whether a prison official acted with deliberate indifference, the court

_____

[8]  The *Wilson* court noted the prisoner-petitioner's acknowledgment "for instance, that if a prison boiler malfunctions accidentally during a cold winter, an inmate would have no basis for an Eighth Amendment claim, even if he suffers objectively significant harm."  501 U.S. at 300.

11

must often consider the constraints facing the official, and "'competing institutional concerns for the safety of prison staff or other inmates.'" *Wilson*, 501 U.S. at 303 (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)).

B.      Evidentiary Record (Claim 1 – Conditions of Confinement)

The allegations in plaintiff's FAC have already been described.  His motion for summary judgment essentially restates the same account of events.  ECF No. 29 at 2-4, 20-23, 33-36.  He argues that Struve and Heinkel were deliberately indifferent by keeping him in Cell 208 between January 8-14, 2023.[9]  *Id*. at 2.

Defendant Struve declares that the entire region around Sacramento received historic rains in January 2023.  ECF Nos. 36-9 at 2 ¶ 3.  Flooding at the Sacramento County Jail led to the transfer of approximately 450 Jail inmates to the state prison facility at CSP-Sacramento.  *Id*.  The Jail inmates were housed throughout the CSP-Sacramento facility.  *Id*.  The heavy rains also caused significant damage, leaks, and flooding of buildings at CSP-Sacramento.  *Id*. at ¶ 5.  Maintenance staff were notified of the leaks in Building 1, but they could not provide a timeline for repair.  *Id*.  Many inmates, including plaintiff, were "identified for rehousing due to in-cell leaks."  *Id*. at ¶ 6.  Some cells with severe leaks were "redlined."  *Id*.  Some other cells may have been temporarily open due to a prisoner leaving for acute mental health or medical care, but those needed to remain available for returning prisoners.  *Id*.  "The severe weather, failing roofs, and evacuation of County Jail inmates combined to create a situation where incarcerated persons throughout the prison had to temporarily house in leaking cells until the County Jail inmates could be safely relocated to create room to move people."  *Id*. at ¶ 8.

Struve had no authority or control over relocating the Jail inmates.  *Id*. at ¶ 7.  After the Jail inmates left, all Building 1 inmates including plaintiff were moved into Building 5 on January 14, 2023.  *Id*. at 3 ¶ 9.

Struve acknowledges that the roof damage in Building 1 was so extensive that the entire roof had to be replaced.  *Id*.  However, he has no knowledge that the leaking water was

---

[9]  Plaintiff's motion states he was moved out of Cell 208 on January 15, but elsewhere the record establishes that the date was January 14.  ECF No. 36-9 at 3 ¶ 9; ECF No. 12 at 7.

12

contaminated, unsafe, or caused burning sensations and constricted breathing. *Id*. at ¶ 10. He worked in Building 1 but did not experience these symptoms. *Id*.

Defendant Heinkel's declaration concurs that heavy rain caused leaks throughout the prison and that there were no available cells to rehouse inmates. As with Struve, he had no control over relocating Jail inmates, he was unaware of any contamination in the rainwater, and he also worked in Building 1 and did not experience symptoms. ECF No. 36-10 at 2-4.

Heinkel submits email correspondence with maintenance personnel. *Id*. at 9-15. It appears that on January 5, maintenance informed that "large portions of roofing were blown off last night on multiple facilities" and they were unable to provide a timeline for repair of severe leaks in the B-1 control office. *Id*. at 9. On January 9, non-defendant staff inquired about moving some B-1 inmates to the B-5 building. *Id*. at 10. According to these inquiries, 14 cells in B-1 had a couple of inches of water in them, and inmates in 5 cells (including plaintiff's Cell 208) were "willing to move." *Id*.; *id*. at 13. Apparently, there was no response to the January 9 emails.

Heinkel adds that he does not recall having a discussion with plaintiff on January 11. *Id*. at 3 ¶¶ 9, 10. Based on his review of records of the vacancy in Building 8, cell 110, he declares that the occupant of that cell "was only temporarily moved for quarantine." *Id*. at ¶ 10. It was not possible to move plaintiff to that cell because there would have been no place to put the quarantined occupant if he was cleared before the Jail inmates left. *Id*.

Plaintiff disputes most of the facts asserted by Struve and Heinkel, including whether the rains of January 2023 were "historic," the number of inmates who arrived from the Jail, whether they were housed throughout CSP-Sacramento or just in building B-5, whether maintenance personnel were informed of leaks and whether they responded, whether the storms caused significant damage throughout the prison and whether the roof was too damaged to repair, whether he was one of many incarcerated persons who was identified for rehousing due to cell leaks, whether there was no room to relocate inmates, and whether staff were also working in the flooded facilities. *See* ECF No. 41 at 7-10. Defendants counter that plaintiff fails to offer evidence that refutes their factual assertions. ECF No. 42 at 14-20.

////

C.        Analysis (Claim 1 – Conditions of Confinement)

Plaintiff fails to show any genuine issue of material fact as to either prong of his conditions-of-confinement claim.  As for the objective prong, plaintiff has not shown a genuine issue as to whether there was flooding throughout the prison in January 2023, and indeed that the rain event was so severe that inmates were relocated from the County Jail.  The parties agree that water leaked into plaintiff's Cell 208, but plaintiff has not shown a genuine issue whether Cell 208 was affected in such an extreme manner as to have constituted a substantial risk of serious harm specific to him, or an excessive risk to his health or safety during the week that he remained there.  *See Pauley v. California*, No. 2:18-cv-2595, 2018 WL 5920780, at *5 (E.D. Cal. Nov. 4, 2019) ("[a] number of courts have concluded that poorly maintained surfaces, wet floors, or leaky roofs do not pose a substantial risk of serious harm supporting a constitutional violation").  Nor is there any evidence that Struve or Heinkel were responsible for the leaking roof and water in Cell 208 or the inability to promptly repair it.  *See Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (liability under § 1983 requires a showing of the defendant's personal involvement or a causal connection between the defendant's wrongful conduct and the constitutional violation).

As for the subjective prong of the test, plaintiff also fails to show a genuine dispute as to whether Struve or Heinkel acted with wanton disregard for his health and safety.  Plaintiff fails to counter defendants' declarations that neither Struve nor Heinkel had any control over the influx of Jail inmates filling the facility.  Neither has plaintiff countered with any evidence refuting that he was identified as an inmate to be moved if cells opened, or that there were no unaffected cells available to move plaintiff.  Nor does plaintiff counter with evidence refuting that cell 110 in Building 8 was kept open for the possible return of its occupant.[10]  Likewise, he presents no countering evidence that building maintenance staff were unable to immediately repair the leaking roof, and that plaintiff along with other inmates were moved to another building when it became available.  Plaintiff disagrees with these declared facts, but he offers no persuasive evidence that there is any genuine dispute requiring trial.

_____

[10] Prison officials have discretion to assign housing.  *Meachum v. Fano*, 427 U.S. 215, 225-27 (1976).

14

Construing all reasonable inferences in plaintiff's favor, plaintiff fails to show that either Struve or Heinkel was deliberately indifferent to any threat to plaintiff's safety, in the context of the constraints created by the general conditions of flooding and damage throughout the prison facility, the presence of the additional Jail inmates, and the inability of maintenance staff to make immediate repairs.  Summary judgment must be entered in favor of defendants on the conditions of confinement sub-issue of Claim 1.

Eighth Amendment Deliberate Indifference (Claims 2 and 9)

A.   Legal Standard – Deliberate Indifference (Claim 2)

To establish a constitutional violation "based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial of serious harm." *Farmer*, 511 U.S. at 834.  An inmate's Eighth Amendment rights are violated by a prison official if that official exposes an inmate to a "substantial risk of serious harm," while displaying "deliberate indifference" to that risk.  *Id.*  An official, however, is only liable if the "culpable action, or inaction, is directly attributed to them" *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011).  Further, a plaintiff must have suffered some type of pain or harm that is more than de minimis in order to implicate the Eighth Amendment.  *See, e.g.*, *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) ("delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference … unless the denial was harmful").

B.   Evidentiary Record (Claim 2)

Plaintiff's motion for summary judgment reiterates the allegations of his FAC.  ECF No. 49 at 4-5, 26-27, 42-43.  He argues that Pohovich and Lujan were deliberately indifferent by ignoring his complaints of pain after his fall and taking him back to Cell 208 on January 8.  *Id*. at 27, 43.

Pohovich declares that the officers escorting plaintiff on January 8 called for medical evaluation, that the medical staff who answered the call cleared plaintiff to return to his cell, and that Pohovich relied on the expertise of medical staff.  ECF No. 36-7 at 2 ¶¶ 3-4.  The escorting officers placed plaintiff on a gurney because he refused to stand and walk.  *Id*. ¶ 5.  Pohovich submits a video showing the fall, the medical staff arriving and leaving, and plaintiff being placed

15

on the gurney. *See* ECF No. 37 (hereinafter "Pohovich Video").

The Pohovich Video shows water on the floor in the hallway where plaintiff was escorted, and someone attempting to sweep away the water. Pohovich Video, at 0:48 – 1:00. Plaintiff appears to be walking at an unhurried pace. *Id*. at 1:00 – 1:06. Plaintiff is escorted by three officers, one on each side and one behind him.[11] *Id*. at 1:06 – 1:08. The officers at his sides hold his arms and appear to be supporting him. *Id*. When plaintiff slips, his legs move out in front of him and he first lands straight down and then rolls to his side. *Id*. at 1:00 – 1:09. The officers continue to hold his arms as plaintiff goes to the floor; they do not fall with him. *Id*. Additional staff come and go as plaintiff remains on the floor. *Id*. at 1:55 – 4:20. A person with a clipboard arrives; apparently this is Rosales arriving to conduct a medical evaluation. *Id*. at 4:24.

The Pohovich Video switches to a different camera with a closer view of Rosales. *Id*. at 4:32. Rosales stands over plaintiff and appears to speak with him, writes something on the clipboard, and leaves. *Id*. at 4:32 – 5:23. Other officers are seen standing about. *Id*. at 5:23-6:20. An unidentified official in a light-colored jacket is seen arriving, appears to talk with plaintiff, and then leaves. *Id*. at 6:00 – 7:17. A gurney is brought to the scene. *Id*. at 6:20.

The video switches back to the original camera view. *Id*. at 7:20. Plaintiff is lifted onto the gurney by Pohovich and three other officers. *Id*. at 7:45 – 8:00. Pohovich and the other officers lift the gurney and proceed down the hallway out of camera view. *Id*. at 8:00 – 8:13.

Defendant Lujan declares that he arrived on scene in response to a call for assistance after plaintiff fell. ECF No. 36-8 at 2 ¶ 3. Medical staff arrived and cleared plaintiff to return to his cell. Lujan did not interfere with the medical evaluation, he relied on their expertise, and plaintiff was placed on a gurney because he refused to walk. *Id*. at ¶¶ 3-5. Lujan apparently accompanied the officers who carried the gurney back to plaintiff's cell. *Id*. at ¶ 5. Lujan submits a report he prepared the same day (January 8, 2023) which describes the incident and which is consistent with the Pohovich Video. ECF No. 36-8 at 6-7. Pohovich and Lujan submit a copy of the medical report prepared by Rosales. *Id*. at 9; ECF No. 36-7 at 9.

---

[11] Pohovich is understood to be the officer holding plaintiff's right arm, so identified because this appears to be the only female officer.

16

Plaintiff disputes some of defendant's factual assertions, such as whether medical responded to his fall or to a call of a resistant inmate, and whether Pohovich and Lujan had no professional training in medicine. ECF No. 41 at 11. Defendants counter that plaintiff's objections are unsupported. ECF No. 42 at 23-25.

C.      Analysis (Claim 2)

Plaintiff fails to show any genuine dispute over a material issue as to whether Pohovich or Lujan placed him at any substantial risk of serious harm during the escort back to his cell. The floor was clearly wet, but this does not in and of itself pose an excessive risk. *Pauley*, 2018 WL 5920780, at *5; *see also Brown v. Pond*, No. 19-35418, 2022 WL 34134, at *2 (9th Cir. Jan. 4, 2022) (requiring a prisoner to traverse wet grass with shackled hands did not pose an excessive risk to health and safety). Pohovich supported plaintiff as he walked and the group moved in an unhurried manner. Pohovich continued to hold and support plaintiff as he fell. The escorting officers summoned medical staff and waited while plaintiff was evaluated. Lujan arrived at this juncture. Pohovich and Lujan declare that a gurney was used to complete the escort because plaintiff refused to walk.

Construing all reasonable inferences in plaintiff's favor, he has shown no genuine issue whether defendants' conduct during the escort was deliberately indifferent, or whether he had such obvious signs of extreme distress that non-medical officers Pohovich and Lujan should have demanded further medical assessments or care instead of returning him to his cell. Summary judgment must be entered in favor of Pohovich and Lujan on Claim 2.

D.      Deliberate Indifference in Medical Care (Claim 9)

Deliberate indifference to a serious medical need exists if the defendant knows that the inmate "face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992). Deliberate indifference requires a purposeful act or failure to act on the part of the defendant and resulting harm. *Id*. at 1060.

17

A physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Id.* However, it is important to differentiate common law negligence claims of malpractice from claims predicated on violations of the Eighth Amendment's prohibition of cruel and unusual punishment. "Mere 'indifference,' 'negligence,' or 'medical malpractice,' will not support an Eighth Amendment claim. *Broughton v. Cutter Laboratories*, 622 F.2d 4548, 460 (9th Cir. 1980) (citing *Estelle*, 429 U.S. 97, 105-06 (1976)).

Mere disagreement among medical providers on an acceptable course of treatment is not evidence of deliberate indifference. *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004). "Rather, to prevail on a claim involving choices of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Id.*, 391 F.3d at 1058 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). Further, a plaintiff must have suffered some type of pain or harm that is more than de minimis to implicate the Eighth Amendment. *See, e.g.*, *Shapley*, 766 F.2d at 407 (delay of surgery is insufficient, unless harmful).

E.      Evidentiary Record (Claim 9)

As with his other claims, plaintiff's motion for summary judgment twice reiterates the allegations of the FAC. ECF No. 29 at 13-16, 17-19. Plaintiff claims it is an "undisputed fact" that he "suffered a compounded ankle injury" on January 8, 2023. *Id.* at 17.

Based on plaintiff's medical records, Aung declares that a nurse saw plaintiff on January 11, at which time plaintiff had "slight swelling" of his right ankle. ECF No. 36-4 at 2 ¶ 7. Plaintiff saw physician Hlaing on January 13. *Id.* at 2 ¶ 8. Imaging of plaintiff's ankle showed intact bones and no evidence of fracture, dislocation, or subluxation. *Id.* at 3 ¶ 8. Hlaing had an "impression" of "moderate ankle joint arthritis." *Id.* Hlaing ordered temporary orthotics, over the counter pain medications, and topical gel.[12] *Id.*

---

[12] The FAC alleges that plaintiff had irritation of his eyes, nose, and throat, but plaintiff appears to have abandoned this issue. His motion for summary judgment does not mention these complaints, and his medical records indicate that plaintiff showed "no signs or symptoms relating

18

The parties agree that plaintiff first saw Aung on March 17, 2023.  ECF No. 29 at 15; ECF No. 36-4 at 3 ¶ 9.  Plaintiff complained of pain from a slip and fall two months previous, but he showed "no acute signs of distress, ambulated without assistance, had a normal gait, normal range of motion, and no significant deformities."  ECF No. 36-4 at 3 ¶ 9.  Aung recommended continued use of over-the-counter pain medication and continued stretching.  *Id*.

Plaintiff submitted a health care request on March 30, 2023[13] asking to refill his topical gel.  *Id*. at 3-4 ¶ 10; *id*. at 10, 60.  The refill was given.  *Id*. at 4 ¶ 10.  Aung declares that he had not discontinued plaintiff's topical gel and it was available to plaintiff in the canteen or through a health care services request (i.e., the form of request plaintiff used).  *Id*. at 3-4 ¶¶ 10-11.

The parties agree that Aung saw plaintiff a second time on April 11, 2023.  *Id*. at 4 ¶ 11; ECF No. 29 at 18.  Plaintiff complained of a sprained ankle and he requested a cane and orthotics.  ECF No. 36-4 at 4 ¶ 11.  Aung provided the cane but assessed that orthotic equipment was not medically necessary.  *Id*.

The parties agree that plaintiff saw a different physician (Bharat) on May 8, 2023.  Bharat ordered the orthotic shoes and compression stockings that plaintiff requested.  ECF No. 29 at 19; ECF No. 36-4 at 4 ¶ 13.

Plaintiff disputes many of defendants' factual assertions, such as Aung's reported observations of plaintiff's condition on March 17, whether plaintiff ambulated without assistance on April 11, whether Aung did not order orthotics on April 11, and whether Aung discontinued his topical gel.  ECF No. 41 at 19-20.  Defendants counter that plaintiff fails to support his contentions.  ECF No. 42 at 39-42.

////

////

---

to his nose and had unlabored normal respiratory function" during his nurse visit on January 11.  ECF No. 36-4 at 2 ¶ 7.  He "complained of eye irritation, but there was no sign of any redness, discharge, or swelling and he was not rubbing his eyes."  *Id*.  At the visit with Hlaing on January 13, plaintiff had "no complaints regarding burning in his nose, throat, and eyes, or constricting breathing" and "no new problems with vision, smell, or taste, no chest pain, and normal breathing."  *Id*. at ¶ 8.

[13]  Aung's declaration states the date was March 20, 2023, but the request itself appears to be dated March 30, 2023.  *See* ECF No. 36-4 at 10.

F.       Analysis (Claim 9)

Plaintiff has failed to show a genuine issue for trial as to whether Aung was deliberately indifferent in the care he provided in March and April 2023.  Aung assessed plaintiff's gait and presentation, and he provided a cane and advice to continue using over-the-counter pain medication and to continue stretching.  Aung did not discontinue plaintiff's topical gel prescription, and there is no indication that any DME was taken from plaintiff prematurely.  The fact that Bharat subsequently ordered orthotic shoes and compression stockings is insufficient to create a genuine issue whether Aung's treatment choices were medically unacceptable and chosen in conscious disregard of an excessive risk to plaintiff's health.  *Toguchi*, 391 F.3d at 1058. Summary judgment must be entered in favor of Aung on Claim 9.

Excessive Force (Claim 4)

A.       Legal Standard (Claim 4)

To establish a claim for the use of excessive force in violation of the Eighth Amendment, a plaintiff must demonstrate that prison officials applied force maliciously and sadistically to cause harm, rather than in a good faith effort to maintain or restore discipline.  *Hudson,* 503 U.S. at 6-7.  In making this determination, the court evaluates (1) the need for application of force, (2) the relationship between that need and the amount of force used, (3) the threat reasonably perceived by the responsible officials, and (4) any efforts made to temper the severity of a forceful response.  *Id.* at 7; *see also id.* at 9-10 ("The Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." (internal quotation marks and citations omitted)).  De minimis touching, even if malevolent, does not rise to the level of a constitutional violation unless repugnant to the conscience of mankind.  *Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010).  "Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately controls."  *Id*. at 38. To prevail on an Eighth Amendment claim based on a de minimis use of force, the inmate must show that the force was applied "maliciously and sadistically rather than as part of a good-faith effort to maintain or restore discipline."  *Id*. at 39 (cleaned up).

20

B.     Evidentiary Record (Claim 4)

The FAC's allegations that Pohovich and Lujan made plaintiff walk too fast have already been described. Plaintiff's summary judgment motion omits any further mention of this. *See* ECF No. 29 at 4-6, 26-27, 42-43. The court therefore proceeds from the allegations of the FAC against Pohovich (twisting of plaintiff's handcuffs and fingers, pushing plaintiff into his cell) and Lujan (subtle hitting of ribs; racial slurs, pushing plaintiff into his cell) after plaintiff arrived back at Cell 208 on January 8, 2023. ECF No. 12 at 5, 9, 12.

Pohovich and Lujan both declare that plaintiff's handcuffs were positioned with the keyhole facing inwards, making them very difficult to remove. They also declare that plaintiff began to scream and accuse the officers of assaulting him. Both deny using any force and both deny witnessing any force used against plaintiff. They deny hearing or using any racial slurs. ECF No. 36-7 at 2 ¶¶ 5-6; ECF No. 36-8 at 2 ¶¶ 5-6.

The Pohovich Video shows plaintiff arriving at his cell carried on the gurney. Pohovich Video at 9:18. There appear to be eight officers standing around the cell door, identifiably including Pohovich. *Id*. at 9:20 – 9:28. The officers bring plaintiff to his feet outside the cell. *Id*. at 9:44. They stand around plaintiff and he is not visible to the camera. *Id*. at 9:48 – 11:00. The group breaks up and starts moving away no more than 75 seconds after plaintiff was made to stand. *Id*. at 10:55 – 11:00. The video shows no apparent indication that force was used on plaintiff, or that he was forcibly pushed into his cell.

Plaintiff disputes aspects of defendants' accounts, such as whether the gurney was used because he refused to stand, and whether officers assisted him to his feet. ECF No. 41 at 12-13. Defendants counter that plaintiff does not support his contentions. ECF No. 42 at 25-27.

In his objections to the court's original findings and recommendations, plaintiff pointed out that defendants excepted the cellside allegations subpart of Claim 4 from their request for summary judgment in the text of their motion, ECF No. 36-1 at 23 ll. 15-16, even though the parties' submissions on the cross-motions for summary judgment included the events at cell-side.[14] *See* ECF No. 29 at 1, 45, 73; ECF No. 36-7 at 2 ¶ 6; ECF No. 36-8 at 2 ¶ 6. As noted, the

---

[14] *See Pearson v. Apria Healthcase Group, Inc*., No. 21-55786, 2023 WL 3244001, at *1

court has provided the parties a further opportunity to address whether summary judgment should be granted in favor of defendants regarding the subpart of Claim 4 that alleges cell-side use of excessive force by defendants Pohovich and Lujan. ECF No. 47. None of the parties has submitted any additional evidence with their supplemental briefing. ECF Nos. 48, 50. Plaintiff repeats his allegations that Pohovich "inflict[ed] wanton pain on Plaintiff by bending his fingers beyond their range limit, as she removed handcuffs" and that Lujan "was simultaneously hitting Plaintiff in the ribs with a clenched fist, as he whispered 'swing on me, N****r'" and "[c]ulminating, they pushed Plaintiff in his cell, making him fall into a puddle of brown contaminated water from leaking roof from rain intrusion." ECF No. 50 at 3.

C.    Analysis (Claim 4)

As discussed above, the point at which plaintiff's handcuffs were removed and the alleged excessive force by Pohovich and Lujan occurred begins at 9:20 on the video. Nothing prior to that time mark shows any interaction or contact between either defendant and the plaintiff that can possibly support the plaintiff's claims of excessive force. Thus, the time frame in which the alleged acts could have possibly occurred, if at all, was when the gurney plaintiff was lying on was placed on the floor in front of his cell door. That is when he was lifted up, his handcuffs were removed, and he was placed in the cell. But the video recording at this point is inconclusive either way. It neither confirms nor refutes plaintiff's allegations, because other people in the immediate area that block the view of what was occurring. Thus, we are left with plaintiff's factual allegations that Pohovich was bending his fingers beyond their range limit as she removed the handcuffs and that Lujan was simultaneously hitting plaintiff in the ribs with a clenched fist, and the claim by Pohovich and Lujan that this never happened. Each are percipient witnesses to the event and resolution of their disputed factual allegations is material to the outcome of plaintiff's Claim 4. Whether the allegations are true requires a credibility determination of the witnesses' conflicting versions. Clearly, that cannot be done on a motion for summary judgment. ////

(9th Cir. May 4, 2023) ("Pearson's summary judgment motion, though not titled as such, was a motion for partial summary judgment.").

There remains the issue of whether plaintiff can make any showing of anything more than de minimis physical injury, as defendants argue that his medical records do not indicate that plaintiff complained of injuries from this event during his nurse visit on January 11 or his visit with Hlaing on January 13.[15]  ECF No. 48 at 2; *see* ECF No. 36-4 at 2-3, 21-23, 107-116 (medical records).  But according to the *Wilkins* standard, there remains a factual issue whether there was finger-bending, rib-hitting, and pushing that was done maliciously and sadistically rather than as part of a good-faith effort to maintain or restore discipline.[16]  Defendants have not shown an absence of a genuine factual issue for trial, and plaintiff equally has not carried his burden to show that events unfolded as he alleges and that he is therefore entitled to judgment as a matter of law.  The court must deny summary judgment to all parties on Claim 4.

<u>Retaliation (Claims 1, 5, 6, 8 and 10)</u>

A.      <u>Legal Standard (Claims 1, 5, 6, 8 and 10)</u>

An inmate's First Amendment claim of retaliation requires the inmate to show:  "(1) [a]n assertion that a state actor took some adverse action against the inmate (2) because of (3) that inmate's protected conduct, and that such action (4) chilled the inmate's First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote and citation omitted).  As to the last factor, legitimate correctional goals include maintaining order and safety within the prison. *Sandin v. Conner*, 515 U.S. 472, 482-83 (1995).  The inmate must show evidence of retaliatory

---

[15]  Section 1997e(e) of the Prison Litigation Reform Act "requires a prior showing of physical injury that need not be significant but must be more than de minimis," but this applies only to claims for mental and emotional injury. *Oliver v. Keller*, 289 F.3d 623, 627, 630 (9th Cir. 2002).  "To the extent that [] claims for compensatory, nominal or punitive damages are premised on Fourteenth Amendment violations, and not on emotional or mental distress suffered as a result of those violations, § 1997e(e) is inapplicable and those claims [involving only de minimis injuries] are not barred." *Id*. at 630.

[16]  As for Lujan's alleged racial epithets, verbal harassment and abuse, they do not by themselves rise to the level of an Eighth Amendment constitutional violation. *Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997), *overruled in part on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884-885 (9th Cir. 2008); *see also Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996), *amended* 135 F.3d 1318 (9th Cir. 1998) (disrespectful and assaultive comments by prison guard not enough to implicate the Eighth Amendment).  Any such conduct, however, would be relevant to the officers' state of mind and whether they were motivated by legitimate penological needs or a malicious intent to inflict harm.

motive, and a genuine issue whether legitimate correctional goals cited by defendant are merely pretextual. *Long v. Sugai*, 91 F.4th 1331, 1339 (9th Cir. 2024). A mere sequence of events is insufficient to show retaliatory motive. *Id*.

All of plaintiff's retaliation claims are based on alleged retaliation in response to plaintiff's grievances and/or this lawsuit, and/or his threats to file grievances and/or lawsuits. Prisoner grievances and lawsuits, and threats to file grievances or lawsuits, are protected First Amendment speech. *Brodheim v. Cry*, 584 F.3d 1262, 1266 (9th Cir. 2009); *Entler v. Gregoire*, 872 F.3d 1031, 1036 (9th Cir. 2017).

B.    Evidentiary Record (Retaliation Claim 1 against Struve and Heinkel)

Plaintiff's motion for summary judgment again "realleges and reincorporates" the allegations of the FAC, and he again characterizes his allegations as "undisputed facts." ECF No. 29 at 2-3, 20-25, 33-38. According to the FAC, plaintiff "vent[ed] of grieving and forewarning of lawsuit" to Struve on January 10, 2023, while they discussed moving plaintiff to another cell. ECF No. 12 at 6. On January 11, 2023, plaintiff "forewarned" Heinkel of a grievance when Heinkel refused to move plaintiff to cell 110 in the B-8 building. *Id*. at 7.

Struve's and Heinkel's declarations about the January rain event, the full-capacity at the prison due to housing Jail inmates, and the reason cell 110 in the B-8 building was held for a returning prisoner, have been discussed above. Plaintiff disputes defendants' factual assertions, but he does not provide evidence to counter these facts.

C.    Analysis (Retaliation Claim 1 against Struve and Heinkel)

Plaintiff cannot show the first element of a retaliation claim against Struve or Heinkel: that they took an adverse action against him by not moving him to a cell that was unaffected or less affected by the January 2023 rain event. Struve and Heinkel have declared and provided evidence that there were no such cells available to move plaintiff to, and plaintiff has not shown any genuine issue countering their declarations. Even if the temporarily empty cell in the B-8 building was in better condition than plaintiff's Cell 208 in the B-1 building (which is unclear on this record), that cell was unavailable because it needed to be held for the possible return of its quarantined occupant. Moreover, plaintiff has shown no genuine issue as to whether Struve or

24

Heinkel had any ability to have the leaky roofs repaired, or to remove the Jail inmates to make more cells available. Struve and Heinkel's inability to obtain repair of plaintiff's Cell 208, to evict the Jail inmates, or to move plaintiff, are not adverse actions because plaintiff has not shown a genuine issue whether either of them had any control or discretion in these matters.

Second, plaintiff has not shown any genuine issue whether Struve's or Heinkel's inability to obtain repairs or to move plaintiff to another cell was "because of" his forewarnings of grievances and lawsuits. Finally, Struve and Heinkel have demonstrated a legitimate, non-pretextual correctional goal of housing all inmates as best as possible in the circumstances and constraints presented, which meant that plaintiff had to continue in Cell 208 until the Jail inmates left. Plaintiff has not shown any genuine issue of material fact for trial. Summary judgment must be entered for defendants on the retaliation sub-issue of plaintiff's Claim 1.

D.      Evidentiary Record (Retaliation Claim 5 against Kuppinger)

Plaintiff's motion for summary judgment again "realleges and reincorporates" the allegations of the FAC regarding Kuppinger, and plaintiff again characterizes his allegations as "undisputed facts." ECF No. 29 at 6-9, 17-19.

Kuppinger declares that he inspected and inventoried plaintiff's property when plaintiff moved to CSP – Sacramento from the prison in Corcoran.[17] ECF No. 36-11 at 2 ¶ 3. He transferred the property from boxes into bags. "The bags hold more than the boxes, so less of them were needed to hold Mr. Thompson's property." *Id*. Plaintiff's television had lines across the screen when turned on, and the printhead on the typewriter was not operating correctly. *Id*. Kuppinger cites a provision from the California Department of Corrections and Rehabilitation (CDCR) Department Operations Manual (DOM): "… inmate personal property, including that which is altered, exceeds volume limitations, or is beyond repair, shall be disposed of[.]" *Id*. at 36-11 at 2 ¶ 6 (citing DOM § 54030.12.2(a) (copy at ECF No. 36-11 at 63)).

*////*

---

[17] The FAC cites "section 3134(c)(3)" for plaintiff's allegation that his property should have been opened in his presence, ECF No. 12 at 13, but Cal. Code Regs. section 3134(c)(3) is a general mail regulation that applies to incoming packages, not to property transfers between prisons. *See* ECF No. 36-11 at 2 ¶ 3.

Kuppinger agrees that plaintiff refused to sign for receipt of his property on January 16 and so did not receive the property that day. *Id*. at 3 ¶ 6. Plaintiff initiated a grievance on January 16 (#359313). *Id*. at 3 ¶ 7; *id*. at 33-43. The grievance was ultimately denied on May 1, 2023. *Id*. at 3 ¶ 7; *id*. at 42.[18]

Plaintiff signed the receipt and received his property on January 29. *Id*. at 3 ¶ 8. Kuppinger allowed plaintiff to have his typewriter because plaintiff said he could fix the printhead himself. *Id*. at ¶ 10. The same day, January 29, plaintiff initiated another grievance (#362050) complaining that the typewriter keys were smashed and the typewriter made a rattling noise when turned on, and requesting compensation. *Id*. at 3-4 ¶ 10; *id*. at 31-34.

When plaintiff was moved to segregated housing on April 19, 2023, another officer (Williams) inventoried and packed plaintiff's property, and Kuppinger reviewed Williams's work. *Id*. at 3 ¶ 9. The grievance complaining of damage to the typewriter (#362050) had not been exhausted as of plaintiff's move to segregated housing, so Kuppinger held the typewriter as confiscated, damaged property. *Id*. at 4 ¶ 10.

Kuppinger forwarded a form to plaintiff to authorize sending the typewriter for repair. *Id*. Plaintiff declares that he twice mailed the necessary authorization to Kuppinger, on June 19 and again on June 27, 2023. ECF No. 29 at 31-32. Kuppinger declares that he never received either mailing. ECF No. 36-11 at 4 ¶ 12. He continues to hold the typewriter pending authorization for repair, and he submits photographs of the typewriter. *Id*. at 4 ¶ 12; ECF No. 42-1 at 2 ¶ 3; *id*. at 4-8. It is not apparent from these photographs whether or how the keys are damaged.

Kuppinger denies retaliatory motive for retaining the typewriter. ECF No. 36-11 at 5 ¶ 18. He denies damaging the typewriter or the television. *Id*.

////

---

[18] Kuppinger submits four grievances from plaintiff about his property. Grievance #353143 was initiated on January 16, 2023 and complains that plaintiff's property was not damaged when it left Corcoran, that Kuppinger broke items, and that Kuppinger withheld legal property. ECF No. 36-11 at 21-26. Grievance #359313 was also initiated on January 16 and complains that the property officer at Corcoran (De La Torre) had damaged plaintiff's property. *Id*. at 35-43. Grievance #353143 appears to have been initiated January 17 and complains that Kuppinger withheld or discarded plaintiff's legal property. *Id*. at 27-30. Grievance #362050 was initiated January 29 and complains that the typewriter was damaged. *Id*. at 31-34.

Plaintiff disputes many of Kuppinger's factual assertions, including whether Kuppinger acted in accordance with policy. ECF No. 41 at 13-16. Defendants counter that plaintiff does not support his contentions. ECF No. 42 at 27-34.

E.      Analysis (Retaliation Claim 5 against Kuppinger)

The court notes at the outset that plaintiff appears to have abandoned the FAC's allegations about "reduced" property, missing legal books, and the television. The parties' summary judgment pleadings focus on Kuppinger's actions with respect to the typewriter.

Also, plaintiff's retaliation claim against Kuppinger is really two separate claims based on two distinct sets of events. The first claim is based on Kuppinger's processing of plaintiff's property in January 2023. The second claim is based on Kuppinger's role when plaintiff's property was again processed upon his placement in administrative segregation in April 2023.

As to the first instance of alleged retaliation in January 2023, plaintiff cannot show that Kuppinger took any retaliatory action because plaintiff did not initiate any grievance against Kuppinger until after their interaction on January 16, 2023, nor does plaintiff claim he had any interaction with Kuppinger before January 16. When they first interacted on January 16, Kuppinger had already processed plaintiff's property and had already determined that the typewriter was damaged, and so his actions cannot have been "because of" the grievance that plaintiff filed after he left Kuppinger on January 16. There is no credible showing that Kuppinger knew of any grievances that plaintiff may have filed against other prison officials prior to January 16, and such a premise is also too attenuated to satisfy the causal element of a retaliation claim.

Plaintiff cannot show that Kuppinger's assessment of damage was wrong because the property officer at Corcoran (De La Torre) declares he had not inspected the typewriter on departure. *See* ECF No. 36-6 at 2 ¶ 4. Nor can plaintiff show that holding the damaged appliances for repair or disposal did not reasonably advance a legitimate, non-pretextual correctional goal because CDCR policy is to repair or dispose of damaged property, and moreover Kuppinger allowed plaintiff to take the typewriter on January 29 based on plaintiff's representation that he could fix it. Plaintiff has failed to create a genuine issue as to whether Kuppinger's actions on or before January 16 were retaliatory in violation of plaintiff's rights

27

under the First Amendment.

As to the second instance of alleged retaliation in April 2023, plaintiff again cannot show that Kuppinger took any retaliatory action. Plaintiff himself initiated a grievance (#362050) on January 29, 2023 complaining that the typewriter was damaged in that the keys were "smashed in" and there was a rattling noise, and seeking compensation.[19] ECF No. 36-11 at 31-32. Plaintiff cannot show that Kuppinger confiscated the typewriter as retaliation for plaintiff's protected First Amendment activity, because plaintiff himself had claimed that the typewriter was damaged, and CDCR policy requires repair or disposal of damaged property. Moreover, plaintiff cannot show that repair or disposal of damaged property does not advance a legitimate correctional goal, or that Kuppinger's application of this policy was pretext for retaliation. Kuppinger had released the typewriter to plaintiff in January 2023 based on plaintiff's representation he would repair the typewriter. But plaintiff thereafter claimed the typewriter had been damaged, and he sought compensation. By his own claims, plaintiff himself had identified the typewriter as damaged property as of its re-entry into the property office in April 2023, and so he cannot show Kuppinger's adherence to policy was pretextual. Plaintiff has failed to show a genuine issue as to whether Kuppinger's April 2023 confiscation and continued hold on plaintiff's typewriter is retaliatory in violation of plaintiff's rights under the First Amendment. Summary judgment must be entered in favor of Kuppinger on Claim 5.

F.      Evidentiary Record (Retaliation Claim 6 against Haynie, Heinkel, and Struve)

Plaintiff's motion for summary judgment repeats the allegations of the FAC, that Heinkel, Struve, and Haynie retaliated against plaintiff for filing a grievance, through their roles in making and reviewing a rules violation report (RVR). ECF No. 29at 40-41.

Heinkel declares that he was assigned to investigate plaintiff's grievance #355867. ECF No. 36-10 at 4 ¶ 14. Plaintiff initiated this grievance on January 23, 2023, complaining that non-defendant officer Bennett had failed to timely release plaintiff for morning appointments on January 20 and 22, 2023. *Id*. at ¶ 13. According to Heinkel's investigation, plaintiff had four

_____

[19] The grievance (#362050) was denied, on grounds that investigation had not shown any evidence of staff misconduct. ECF No. 36-11 at 33.

appointments scheduled the morning of January 20, beginning with an appointment at the library at 8:00 a.m. *Id.* at ¶ 14. But plaintiff was not called for his library appointment until 9:25, and he chose to attend the library appointment instead of his 9:30 mental health appointment. Thereafter, he attended his two remaining appointments. *Id.* Heinkel did not find any record that plaintiff was scheduled for medical ducats on January 22. *Id.* In making these findings, Heinkel relied on attendance records and decided it was unnecessary to interview plaintiff. *Id.* at 5 ¶ 15. Grievant interviews are optional under Cal. Code Regs. tit. 15, § 3483(e) (2023). *Id.*

Heinkel believed that plaintiff's grievance #355867 was based on a knowingly false account of events, because the grievance complained that officer Bennett had not timely released plaintiff to attend appointments whereas the library was late in calling plaintiff for his first appointment on January 20 and then plaintiff attended two more appointments that morning, but he did not have any appointments scheduled for January 22. *Id.* at ¶ 16. Heinkel submitted a RVR (#7265611) against plaintiff for making false allegations in the grievance. *Id.* at ¶¶ 16, 18. Heinkel denies retaliatory motive for the RVR. *Id.* at 7 ¶ 26.

Struve was the reviewing supervisor for Heinkel's RVR #7265611. ECF No. 36-9 at 3 ¶ 11. Struve declares that his role was to "ensur[e] that the circumstances of the rules violation report coincide with the charge." *Id.* Struve concluded that the circumstances did coincide with the charge, but he did not investigate or adjudicate the RVR. *Id.* Struve also denies retaliatory motive. *Id.* at ¶ 12.

Haynie is a correctional lieutenant who classified the RVR as a serious offense. ECF No. 36-5 at 2 ¶¶ 5-6. He denies that this classification was retaliation for plaintiff's complaints or grievances. *Id.* at 3 ¶ 8. He declares he "take[s] no offense when an incarcerated person grieves issues at SAC or names me in a grievance. [] The grievance process is part of everyday life in a prison setting and incarcerated persons have a right to submit these grievances." *Id.* at 2-3 ¶ 7.

A hearing officer concluded on January 30, 2023, that there was insufficient evidence to find that plaintiff knowingly falsified the information alleged in the grievance. ECF No. 36-10 at 5 ¶ 17. Heinkel nevertheless maintains that plaintiff's grievance was "at best, inaccurate." *Id.* at ¶ 18.

Plaintiff disputes that attendance records show he attended some of his appointments, as well as defendants' declared roles, motives, and some of their actions, but he does not offer evidence to support his contentions.  *See* ECF No. 41 at 17-18; ECF No. 42 at 34-37.

G.      Analysis (Claim 6 against Haynie, Heinkel, and Struve)

It is clear that Heinkel initiated the RVR in relation to plaintiff's grievance #355867, because the truth or falsity of the grievance was the very subject of the RVR.  The Department Operations Manual explicitly authorizes prison officials to initiate RVRs for the precise reason Heinkel did here – to discourage grievances based on false information.

The fact that a hearing officer found insufficient evidence to support the RVR is itself not any basis to conclude that the RVR was made for retaliatory reasons.  The grievance was based on a misstatement of facts by plaintiff.  Whether there was enough evidence to show the misrepresentations were made knowingly was a question for the hearing officer to resolve, but the officer's finding did not equate with the conclusion that the RVR was brought for retaliatory purposes.  Discouraging falsity in grievances is a legitimate correctional goal, and allowing reports of false information in grievances to be investigated is a reasonable method to accomplish the goal.  Plaintiff has not adduced evidence to show that the reviews conducted by Struve and Haynie were retaliatory rather than intended as a check against unmeritorious RVRs.  In this case, both Struve and Haynie concluded that Heinkel's RVR stated an adequate basis to proceed.

Plaintiff has not shown a genuine issue as to retaliatory motive on the part of Heinkel, Struve, or Haynie in making their determinations.  He also has not shown that their actions failed to reasonably advance a legitimate correctional goal.  Summary judgment must be entered for defendants on Claim 6.

H.      Evidentiary Record (Claim 8 against Heinkel and Pohovich)

Plaintiff alleges that Heinkel and Pohovich searched his cell on April 4, 2023[20] and/or they "vandalized" his property as retaliation for filing this lawsuit.  ECF No. 12 at 20.

////

_____

[20]  As noted in footnote 3 *supra*, plaintiff's FAC alleged the cell search occurred on February 4, 2023, but all parties now agree the date was April 4, 2023.

Pohovich declares that she does not remember searching plaintiff's cell, but she nevertheless denies that the search was retaliatory. ECF No. 36-7 at 3 ¶ 10. Plaintiff had complained of chest pain and cell searches for narcotics are standard practice after a medical emergency. *Id.* Pohovich denies vandalizing or breaking anything and declares she would have confiscated or disposed of any contraband if she discovered it. *Id.*

Heinkel declares that he was the supervising sergeant that day, but he was not present and did not participate in the cell search. ECF No. 36-10 at 6 ¶ 21. "It is standard practice for custody staff to search a cell following a medical emergency … to ensure that narcotics were not a contributing factor." *Id.* Plaintiff complained to Heinkel about staff disposing of a legal container that plaintiff used for laundry, but the Department Operations Manual requires the disposal of altered personal property. *Id.*

Plaintiff disputes most of defendants' factual assertions, including whether it is standard practice to search cells in response to medical emergencies. ECF No. 41 at 18-19. He argues that "Defendants are exploiting safety and security to retaliate." *Id.* at 18; *see* ECF No. 42 at 38.

As noted, the parties have submitted no additional evidence with their supplemental briefing on plaintiff's retaliation claim against Pohovich. ECF Nos. 48, 50.

I.       Analysis (Claim 8 against Heinkel and Pohovich)

Plaintiff has not shown a genuine issue for trial regarding his claim that the cell search on April 4, 2023, was retaliatory. Heinkel, as noted, did not participate in the search. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (supervisors are only liable for constitutional violations if they participated in or directed them, or knew of and failed to prevent them). Pohovich has no recall of participating in the search and plaintiff, who did not witness the search, has presented no direct evidence that she took the actions he alleges. Rather, plaintiff was away receiving medical care at the time of the search. *See* ECF No. 12 at 20 (his FAC alleges that plaintiff "was removed from his cell for emergency medical treatment due to having an anxiety attack, causing him to have chest pain"); *see also* ECF No. 29-1 at 131 (in support of his motion for summary judgment, plaintiff submitted his grievance about this incident in which he claimed that as he was carried away on a gurney for emergency medical treatment he "heard and saw Sgt. Heinkel order officer

31

Tappan to search my cell, with Pohovich assisting"). Thus, he cannot show a genuine dispute over whether Pohovich undertook to search his cell of her own initiative or for retaliatory motives, or even that it was she who mis-handled his property in the manner he alleges.[21]

Further, plaintiff has not shown that a reasonable fact finder could conclude there was causal link between his protected First Amendment activity and the search. He alleges retaliation "based on chronology of events, timing, and facts, which raises inferences." ECF No. 12 at 20. But that chronology supports no such inference. His argument that the search was retaliation for this lawsuit (ECF No. 40 at 26) is implausible as to timing. Plaintiff filed this lawsuit on March 13, 2023 but it was not served on the defendants until February 13, 2024. Plaintiff has not shown that as of the date of the April 4, 2023 cell search defendants had any actual knowledge of this lawsuit because of the lengthy time-lapse between filing and service. The sequence of events following the initial filing of the complaint are: 1) plaintiff's original complaint was dismissed with leave to amend (ECF No. 10) on June 1, 2023, 2) plaintiff filed an amended complaint (ECF No. 12) on June 27, 2023, 3) the amended complaint was screened in for service of process on defendants on February 13, 2024 (ECF No. 18), and 4) the court's actual order for service of process on defendants was entered on April 3, 2024 (ECF No. 21), almost exactly a year *after* the date of the April 4, 2023 cell search.

In his supplemental brief, plaintiff argues that "from January 8, 2023 until February 2023," he threatened defendants (presumably including Pohovich) "with legal actions and [he] filed grievances" and this was the reason that Pohovich retaliated by vandalizing plaintiff's cell during the April 4, 2023 search, disorganizing his voluminous legal papers and ruining them with a wet substance, tearing family pictures off the wall and confiscating parts of the photos, breaking his head phones and taking a legal file that he used to organize his legal papers – and that

---

[21] Plaintiff's supplemental brief maintains that the other officer (Tappan) acted together with Pohovich in vandalizing his cell. ECF No. 50 at 4-5. Neither plaintiff's original complaint nor his FAC named Tappan as a defendant. ECF No. 1; ECF No. 12 at 2-3. Plaintiff may not bring any newly-stated claim against Tappan at this juncture, and any amendment of his FAC to bring a claim against Tappan would be futile for the reasons stated in this analysis, and not least because plaintiff has not alleged any protected conduct involving Tappan. *See Ctr. For Bio. Diversity v. United States Forest Serv.*, 80 F.4th 943, 956 (9th Cir. 2023) ("Amendment is futile when it is clear that the complaint could not be saved by any amendment." (quoting *Armstrong v. Reynolds*, 22 F. 4th 1058, 1071 (9th Cir. 2022) (cleaned up))).

Pohovich told him to buy another one.[22] ECF No. 50 at 4.  Plaintiff's supplemental argument still fails to show a triable issue of retaliatory motive for the cell search and/or the manner in which Pohovich allegedly conducted it, for the following reasons.

Plaintiff has shown no direct evidence of retaliatory motive.  To survive summary judgment on the basis of circumstantial evidence of retaliatory motive based on his January and February 2023 threats of legal actions and grievances, plaintiff must plausibly show:  "(1) proximity in time between protected speech and the alleged retaliation; (2) that the defendant expressed opposition to the speech; or (3) other evidence that the reasons proffered by the defendant for the adverse action were false and pretextual."  *McCollum v. California Dep't of Corrs. and Rehabilitation*, 647 F.3d 870, 882 (9th Cir. 2011) (quoting *Allen v. Iranon*, 283 F.3d 1070, 1077 (9th Cir. 2002) (cleaned up)); *see also Pratt v. Rowland*, 65 F.3d 802, 807-808 (9th Cir. 1995) (timing, with "little else to support the inference," is insufficient).  Even if the court presumes that plaintiff's January and February 2023 grievances and threats were directed to Pohovich, the temporal connection to the April 4 cell search is attenuated, especially in light of the immediacy of the medical emergency that plaintiff suffered the day of the cell search.  Plaintiff has not shown that Pohovich expressed opposition to plaintiff's grievances and threats.  Nor has plaintiff shown any genuine dispute whether his medical emergency was a false pretext for the cell search or that the search was retaliation for seeking medical assistance.  Defendants have presented unrefuted evidence that such searches are a routine response to a medical emergency, which is done to advance a legitimate, non-pretextual correctional goal of determining whether narcotics were involved in the emergency.

Finally, plaintiff has not shown sufficient evidence to proceed to trial on the question whether it was actually Pohovich who mis-handled his property in the manner he alleges.  He maintains that the non-party officer named Tappan acted together with Pohovich in "vandalizing" his cell.  ECF No. 50 at 4-5.  But plaintiff acknowledges he had been taken away for treatment for

---

[22] Claims alleging random and unauthorized deprivation of property are not cognizable under § 1983, although they may be actionable under California state law in state court.  *See Quintero v. Lemon*, No. 1:23-cv-01233-SAB, 2023 WL 12989, at *3 (E.D. Cal. Oct. 16, 2023).

his medical emergency and so was not present during the search.  ECF No. 12 at 20; ECF No. 29-1 at 131.  Plaintiff cannot credibly testify as to Pohovich's actions (versus Tappan's actions) during the cell search and he presents nothing other than his allegations.

Plaintiff has not shown a genuine issue for trial, and summary judgment must be entered for defendants Heinkel and Pohovich on Claim 8.

J.      Evidentiary Record (Claim 10 against Aung)

Plaintiff argues Aung retaliated against plaintiff's grievance and/or threat of grievance by withholding approval for orthotic shoes, ankle brace, and compression socks.  ECF No. 29 at 18.

The treatment Aung provided to plaintiff has already been discussed.  To briefly summarize, Aung saw plaintiff twice, on March 17 and April 11, 2023.  On March 17 Aung advised continued use of over-the counter medication and stretching exercises.  Aung's response to plaintiff's "forewarning" of a grievance, was to tell plaintiff to spell his name correctly.  ECF No. 12 at 22.  Plaintiff submitted a health care services request (not a grievance) asking for refill of his topical gel.  ECF No. 36-4 at 3-4 ¶ 10; *id*. at 10, 60.  This was under Hlaing's prescription, and Aung had not discontinued it.

Aung's assessment as of April 11 was to order a cane for plaintiff's use.  ECF No. 36-4 at 4 ¶ 11.  Plaintiff filed a grievance on April 11, complaining of Aung's decision to provide only a cane, but not orthotic shoes or compression stockings.  ECF No. 39 at 163-190.   Another physician (Bharat) provided these on May 8.

Aung declares that he provided plaintiff with "appropriate medical care based on my professional training and experience."  ECF No. 36-4 at 4 ¶ 12.  Plaintiff disputes Aung's declaration.  ECF No. 41 at 20; ECF No. 42 at 42.

K.      Analysis (Claim 10 against Aung)

Plaintiff fails to show a genuine issue whether Aung's treatment decisions were based on retaliatory motive rather than a professional assessment of plaintiff's medical needs.  Plaintiff's allegation about the topical gel prescription is simply incorrect because Aung had not terminated the prescription.  Plaintiff has not shown a triable issue whether Aung's treatment decisions were a retaliatory response to his March 17 "forewarning" that he would grieve the care Aung

34

provided.  Plaintiff does not appear to have filed any grievance against Aung until after their second and final visit on April 11, so that grievance could not serve as evidence for retaliatory motive in denying care.  Bharat's subsequent order for orthotic shoes and compression stockings does not create an issue whether Aung had denied those items for retaliatory reasons, because Aung had provided a cane and advised stretching, which Aung had assessed as appropriate care for plaintiff's condition.  None of plaintiff's complaints about the care Aung provided show any actual adverse actions that might be characterized as retaliatory.  Plaintiff has shown no genuine issue of material fact, and the court must grant summary judgment for defendants on Claim 10.

Defendants' Qualified Immunity Argument

Defendants also argue in their summary judgment motion that they are entitled to qualified immunity, but because they initially exempted Claim 4's cell-side use of force from their motion, their argument did not apply to this allegation.[23]  ECF No. 36-1 at 30-32.  Pohovich and Lujan have not made any qualified immunity argument in their supplemental briefing on Claim 4.  ECF No. 48.  Because the court finds that defendants are entitled to summary judgment on all other claims, and because Pohovich and Lujan have not argued for qualified immunity regarding Claim 4 and cellside use of excessive force, it is not necessary to address any potential application of qualified immunity.

**RECOMMENDATION**

For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1) Plaintiff's motion for summary judgment (ECF No. 29) be DENIED in its entirety; and

2) Defendants' motion for summary judgment (ECF No. 36) be DENIED as to Claim 4 regarding excessive use of force by defendants Pohovich and Lujan during their return of plaintiff to his cell on January 8, 2023 and that defendants' motion for summary judgment be GRANTED

---

[23] Defendants did argue that Pohovich and Lujan would be entitled to qualified immunity as to plaintiff's tangential statement in Claim 4 that Pohovich, Lujan, and other officials "aggressively" loaded him onto the gurney for completing the transport to his cell on January 8, 2023.  *See* ECF No. 12 at 12; ECF No. 36-1 at 31.  The court has not construed the aggressive-gurney-loading description as a separate or distinct basis for plaintiff's excessive force claim because plaintiff did not pursue it as such in his own summary judgment pleadings, nor did he mention it in his objections to the initial findings and recommendations, nor in his supplemental briefing.  *See* ECF No. 45; ECF No. 50.

35

as to all other claims and all other defendants.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 12, 2026

_____
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

36